**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY  DIVISION**

| | | |
|---|---|---|
| **GLORIA DICKERSON,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **4:07-cv-44- SEB-WGH** |
| | ) | |
| **WALGREEN CO.,** | ) | |
| **Defendant.** | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Gloria Dickerson ("Dickerson"), is a former store manager for Defendant, Walgreen Co. ("Walgreen").  Who claims that she was fired either because she is an African-American or in retaliation for having complained to Walgreen of racial discrimination.  She asserts, as well, that Walgreen engaged in a pattern and practice of discriminating against African-Americans. Walgreen contends that Dickerson has adduced insufficient evidence to support any of her claims warranting this motion for summary judgment  now before us for a ruling.  For the reasons discussed below, we find merit in Walgreen's motion and grant summary judgment in its favor.

### *Factual Background*[1]

---

[1]In Defendant's supporting brief, we were informed that counsel for Plaintiff has informed Defendant that Plaintiff has elected not to opt out of a class action pending in the Southern District of Illinois, wherein it is alleged that Walgreen discriminated against African-American management employees in terms of store assignments, promotions and compensation. Defendant advances a waiver argument as part of its motion for summary judgment based on Plaintiff's participation in the class action and attaches a copy of a proposed consent decree from that case as support for this assertion.  In her response brief, Plaintiff seems to confirm her

## A. Plaintiff's Early Years With Walgreen

Dickerson began working for Walgreen in Louisville, Kentucky, in July 1977, as an Assistant Manager in Training. Thereafter, she progressed up the store management ladder, receiving promotions and store transfers. Eventually in August 2001, she sought and received the Store Manager position at an Evansville, Indiana, Walgreen store. She remained in that position until her employment was terminated effective May 6, 2006.

Beginning in March 2003, Dickerson's immediate supervisor was District Manager William ("Buddy") McCaffrey. Shortly after becoming her District Manager, McCaffrey recommended Dickerson to participate in the Walgreen Emerging Leader Program ("ELP"), a necessary step if Dickerson wanted to advance to a District Manager position. McCaffrey recommended no other Evansville store manager for the program. McCaffrey remained Dickerson's immediate supervisor through approximately June 1, 2005, and, during that time period, difficulties developed in their work relationship, which ultimately led to Dickerson's accusations against McCaffrey of race discrimination.

## B. Plaintiff's Allegations of Racial Discrimination By Her Supervisor

participation in the class action, claiming the class action lawsuit simply serves as tacit recognition of her disparate treatment and has no "waiver effect" with respect to any of her claims. Without more, such as an affidavit, deposition testimony or a specific pleading from the class action which would demonstrate Plaintiff's inclusion in the class, the record does not suffice to support Defendant's waiver argument. However, we are able to resolve the motion for summary judgment without deciding the waiver issue.

Dickerson complains in this lawsuit of only one individual at Walgreen who ever discriminated against her based on her race, namely, her District Manager, William McCaffrey.  Because her claims against him are so numerous and disjointed, we list them here in chronological order, as excerpted from her deposition testimony and the personal notes she kept while she was a store manager, along with various responsive statements by McCaffrey or Walgreen:

1.    Sometime in July of 2003, a District Manager other than McCaffrey informed Dickerson that she should go to the District Office in order to take a test in connection with the ELP.  Dickerson felt McCaffrey should have been the person to inform her that she needed to take the test.

2.    On July 15, 2003, McCaffrey informed Dickerson that she needed to change her flight arrangements in order to arrive at an upcoming manager's meeting in Las Vegas in time for its start.  Though the meeting date was several weeks away and all flight arrangements for such meetings are handled by Walgreen internally, Dickerson regarded this as late notice and worried that she would not be able to obtain a change in flight arrangements.

3.    On July 16, 2003, Dickerson learned from an employee at another Walgreen store that McCaffrey was arranging for the transfer of that employee's daughter to Dickerson's store.  Dickerson felt that this was unprofessional and disrespectful of her, given that Dickerson always hired the employees for her store, prompting her to phone McCaffrey to complain. McCaffrey explained that it was necessary to transfer the employee based on Walgreen's nepotism policy, that the transfer was temporary and that he thought he had covered the issue with her earlier.

4.    According to Dickerson, during 2003, McCaffrey transferred "good" assistant managers from her store and gave her three poorer performing assistants.  When questioned about this by Dickerson, McCaffrey told her he needed those good performers at other stores, but Dickerson did not believe that other stores were necessarily more in need of better Assistant Managers than she was.  Dickerson's

store was a designated training store.  In addition, McCaffrey expressed to Dickerson that he felt she was a good trainer, which Dickerson does not dispute.

5.  After three "good" Assistant Managers were transferred, Dickerson sent four e-mails to McCaffrey describing the problems she was having running the store with the new assistants and that she needed help, but he never responded. On October 6, 2003, she spoke to McCaffrey about her problems at the store and, according to her notes, he "blew me off once again."  Dickerson reports that she wrote an e-mail to John Grant, a Regional Vice-President, that same day, complaining that McCaffrey was discriminating against her, but she does not recall telling him of any specific incident, only that he was treating her unfairly.

6.  In January 2004, McCaffrey traveled to Evansville from the District Office and visited all the Walgreen stores but the one Dickerson managed.  Dickerson took offense at being excluded and reportedly did not understand why he would do that.

7.  On January 24, 2004, McCaffrey contacted another Evansville store manager to ask him to poll the local managers to determine what they wanted to eat at an upcoming luncheon meeting scheduled for later that week.  Dickerson complains that McCaffrey had been told by a Regional Vice-President that she was the person to handle such business arrangements in Evansville.

8.  On one occasion in 2004, McCaffrey told Dickerson that she was not permitted to leave work to pick up her daughter from school when her daughter was sick, even though he had allowed another white store manager do so.  McCaffrey denies ever telling any of his managers that they could not leave work to pick up a sick child, but does state that he had instructed all of them to have family emergency back-up plans in place for occasions when they were unable to get away from the store.

9.  Dickerson detected two errors in McCaffrey's store audit in June of 2004:  He listed her "one hour waste" percentage at nine percent when it was actually three percent and he listed her store's "effectiveness at taking action on tagging all the items" as below average when it was actually above average.

10.  During a store visit on October 6, 2004, by the Regional Manager, McCaffrey was present with Dickerson and took notes, leaving a copy for Dickerson.  Dickerson alleges that there were certain entries in the notes which were not accurate and did not apply to her store.  When she complained to him, he told her those notes were intended only for himself.  She does not know what, if anything, McCaffrey did with the notes.

11.  After the Regional Manager departed on October 6, 2004, Dickerson sent out an e-mail to the other store managers in the area informing them of the things the Regional Manager had been interested in and areas he inspected during his visit as

well as items that he did not address. On October 13, 2004, another store manager told Dickerson that McCaffrey had told that manager to tell Dickerson "not to send out any more e-mails."  Dickerson believes she was banned from sending out all e-mails and does not know what precipitated that action.  From that point forward, Dickerson would enlist the secretary at the District Office to send out e-mails when she wanted to communicate with the other stores.  McCaffrey states that he never "banned" Dickerson from sending e-mails, but once, after he noticed that she had sent what he thought was an inappropriate e-mail, he did  tell her the address she was using was inappropriate because it  caused her e-mails to go to more recipients than only the management employees.

12.     A vendor supervisor, Susan Shaughnessy, told Dickerson at some point in 2004 that McCaffrey had told her not to reset the coolers at Dickerson's store (when coolers at stores were being reset) because Dickerson was a "manipulator."

13.     Beginning in 2004, Dickerson claims that she complained on several occasions  to Loss Prevention Supervisor, William Bosemer, about the way McCaffrey was treating her.

14.     In order to remain in the ELP, participants were required to pass a "pharmacy tech" test.  Dickerson failed the exam the first two times she took it.  Dickerson complains that McCaffrey removed her from the ELP, although she had never seen any written requirement that she pass the test in order to remain in the program. However, it is undisputed that the application for the ELP which Dickerson signed and was made part of the record, expressly states that an applicant must be certified as a pharmacy technician.

15.     On November 12, 2004, Dickerson had a conversation with McCaffrey regarding a recent e-mail sent by her to him, referencing her inability to work on a Saturday due to family issues.  McCaffrey expressed the need for her to make the right choice when faced with competing work obligations and a family issue, in response to which Dickerson told him she would always choose family.

They also discussed her e-mails to others at Walgreen and she complained to him about his informing other store managers about her performance or her store or other issues that others had no need to know.

They also discussed Dickerson's recommendation that one of her better employees be considered for management and McCaffrey's decision to take that employee out of Dickerson's store and place her elsewhere so that she could train as an Assistant Manager.  Dickerson wanted to train her herself and receive the benefit of having a strong Assistant Manager, but McCaffrey required the employee to be trained in a different store.  Dickerson describes the conversation in her notes as turning hostile at that point, with McCaffrey telling her not to roll her eyes in

response to his comments and her responding that he could not tell her what to do with her eyes. The conversation led her to tell him of additional problems she had with him, prompting McCaffrey to offer an apology which she refused to accept, because, as she told him, he treats her differently from other managers which demonstrates his racial bias.  Dickerson claims McCaffrey laughed in response and denied being prejudiced, but admitted that some in his family harbored feelings of prejudice.

Dickerson asserts that, after she had told McCaffrey that she thought he was tougher on her than he was on other managers, McCaffrey said that, if he really wanted to get rid of her, he could have done so a long time before then.  Dickerson claims that she told him it would have been difficult to get rid of her when she was doing such a good job, whereupon McCaffrey stated that there were ways to put pressure on managers so that any of them will eventually "pop" and that in fact in the past he had made a male manager cry.

After the conversation ended,  Dickerson wrote in her notes that McCaffrey apologized again and asked if they could start over with a clean slate, admitting that his communication skills needed work and that he was not perfect and had his faults.  Dickerson told him she wanted him to keep treating her like he had for the past year and not to change on her account.  Dickerson also wrote in her notes that McCaffrey had commented that her statement did not make sense. She also wrote that McCaffrey had shown her "who he really was" by treating her unfairly for so long and that it was too late for change, the damage had been done.  However, at some point she agreed that they should start anew.

16.    On February 14, 2005,  Dickerson informed McCaffrey of a minority applicant for an assistant manager's position with Walgreen and offered to set up an interview if McCaffrey was going to be in the area that week.  McCaffrey responded to her that same day, indicating he would not be back to the Evansville area for two weeks.  Dickerson complains that McCaffrey later interviewed and hired a white applicant referred by another store manager for that assistant manager position.  However, she admits that McCaffrey thereafter interviewed and hired the minority applicant she had referred to him for another assistant manager position.

17.    On February 18, 2005, Dickerson advised McCaffrey by e-mail that she would not accompany him to a recruiting event at the University of Southern Indiana, located in Evansville, explaining that:

> I have asked Mike Hartman if he would take my place with
> you at USI.  I have thought about this for two weeks now and
> I keep coming up with the same conclusion, that I still feel
> very uncomfortable around you.  Having said that, by no
> means am I trying to make you feel bad or disrupt any
> situation.  I just feel that its better to be honest no matter
> what.  I realize that you and I agreed on starting over, (and we
> have) but, there is still and always will be reservations that I
> have about you.  (Of course that is something that I have to
> work thru) ...  Please do not respond to this email or in person.
> ....

Upon receipt of the e-mail, McCaffrey was unsure what Dickerson was trying to say because he thought that they had resolved the issues she had raised with him. He asked William Bosemer to come into his office to read the e-mail.  Bosemer suggested that, based on her previous allegations of racism, she may be claiming that there is still an issue and McCaffrey should probably forward the e-mail "upstairs."  So, McCaffrey forwarded the e-mail to Employee Relations Director, Jack Kenesey.

Concerned about Dickerson's recent e-mail message and her previous complaints to him and others of discrimination, McCaffrey asked Loss Prevention Manager Sy Coleman to investigate the "concerns" raised by Dickerson in her e-mail. Coleman flew to Evansville and interviewed Dickerson on February 23, 2005. Dickerson provided Coleman with a dossier containing e-mails and notes she had been keeping with regard to her relationship with McCaffrey.  She also complained to Coleman that McCaffrey treated her differently than other managers and was unfair to her, suggesting that re race was the reason.

When Coleman later interviewed McCaffrey and asked him to respond to Dickerson's contention that she was treated differently from other managers, McCaffrey admitted that he did tend to push harder on Dickerson, but only because he felt she had the potential to become a district manager.

18.    Dickerson claims that, after she passed the pharmacy technician certification test, she asked McCaffrey whether she could reapply for the ELP and he responded "we'll see."  On February 24, 2005, McCaffrey informed Dickerson that he wanted to place her back into the ELP, but Dickerson responded that she did not want to go back into the program now, to which McCaffrey replied that she should really think hard about that decision.

19.   Dickerson claims that McCaffrey discriminated against her when, with regard to her annual evaluation, he told her she needed to lower her self-evaluation so that it was the same as his supervisory evaluation.  Dickerson claims that she did what he asked, but then he lowered his supervisory evaluation of her.  However, it is unclear from the record which year Dickerson is referring to.  One of her personal notes, which is included as a part of Exhibit V to Defendant's summary judgment brief, refers to this incident under a heading of March 2003; however, McCaffrey did not become Dickerson's manager until sometime in March of 2003.  The annual evaluations that are a part of the record show that Dickerson did not lower her own rating on her 2003 annual evaluation, as she rated herself as "outstanding," which is the highest rating.  The 2004 evaluation does show that Dickerson rated herself as "exceptional/above average" and McCaffrey's rating was only a "meets expectations."  Nevertheless, the 2005 evaluation contains a handwritten note stating "rated myself lower"with an arrow pointing to the store manager's self-rating of "meets expectations," but on that evaluation McCaffrey's rating is also a "meets expectations."

In June of 2005, when McCaffrey moved on from his position as Evansville's

District Manager and Dickerson's supervisor, he had never taken any formal disciplinary

action against Dickerson during the entire time he acted as her supervisor.  Significantly,

Dickerson does not claim that anyone other than McCaffrey at Walgreen discriminated

against her based on her race.  Patrick Bradley became Dickerson's new District Manager

and remained her supervisor through the date of her termination in May of 2006, but

Dickerson does not claim that Bradley ever discriminated against her.

Dickerson does claim that she went to Bradley sometime in March of 2006 to

inquire as to whether Walgreen offered any diversity training for employees in connection

with district meetings.  She indicates that Bradley promised to get an answer to her

question and later reported to her that the company had no such classes or training

materials, but that he was receptive to the idea of including a discussion of diversity issues as a part of employee training in his district.

## C.  Plaintiff's Termination

Dickerson's termination occurred after a routine audit conducted on April 6, 2006, developed into a full investigation of a "found money" incident.  During the audit, Lisa Priest, a Loss Prevention Supervisor, discovered an envelope in the store safe which had the name and address of a customer on it along with a notation that the envelope contained $100 in found money as well as a reference to a store Assistant Manager, Mike Johnson.  However, only $40 in currency was actually contained in the envelope. Dickerson was on vacation the week of the audit, so Priest asked Mike Johnson about the missing $60.  Though initially claiming a lack of knowledge regarding the missing money, Johnson later returned to Priest with Assistant Manager in Training, Dianne Menefield, who explained that there had been a large shortage in the photo department drawer one evening and Dickerson had authorized the use of the "found money" in the envelope to cover the shortage.  Priest indicated to Mennefield and Johnson that she would return the following week when Dickerson had returned to investigate the situation further.

Walgreen's "found money" policy provides that money found and turned in to the store by a customer may be returned to the customer who found it, if not claimed within

two weeks.  On March 27, 2006, a customer found a $100 dollar bill and turned it in to

Mike Johnson.  Johnson told the customer he would call her if the money went

unclaimed, whereupon he put the money in an envelope, labeled it and placed it in the

safe.  On March 31, 2006, a cashier in the photo department had a shortage when closing

out her register.  She had given a customer change for a $100 bill, but, when she checked

the drawer later, the $100 bill was missing, causing her to believe she may have given the

bill back to the customer as part of her change.  She brought this shortage to the attention

of Ms. Mennefield.

The details of what occurred on that March 31 differ with each individual witness.

However, there is no dispute among the witnesses that Dickerson, Mennefield and

Johnson were all present at the store the day the cashier reported the shortage and they

were all involved in a discussion of how to handle the problem.  A day or two earlier,

Johnson had brought the $100 in found money to the attention of Dickerson, who had not

previously known of its existence.  When the cash imbalance on March 31 arose, Johnson

reminded her of the $100 dollar bill that a customer had found.  Dickerson told Johnson

and Mennefield that it would be alright to use the found money to balance the drawer.

Priest returned to the store on April 13, 2006, to investigate further the incidents of

which she had learned while conducting the audit.  She informed Dickerson that she was

investigating a possible violation of the slush fund policy and would be talking with

Dickerson later after she had a chance to take statements from some of the other

employees.  Priest obtained statements from several employees, including Jason Deason,

another Assistant manager in training, who offered no information directly relating to the

particular incident at issue, but stated that he was aware of money occasionally being left

"under the tray" and on one occasion it was used by an Assistant Manager, Trey Daniels,

to balance a drawer.  Deason also wrote in his statement that Dickerson had told him to

use coupons from a stash of extras to balance a drawer if the coupon count did not

balance.  Later, when Priest approached Dickerson, Dickerson declined to provided a

written statement, indicating she needed to leave the store to pick up her children.

However, Dickerson  later provided a short written statement which indicated that,

because the name of the customer who was thought to have received the extra money in

change was known, she authorized the use of some of the "found money" to balance the

drawer on March 31 after which she called the customer to leave a message for that

customer to check her change to see if her $100 bill had mistakenly been given back to

her.  By coincidence, Dickerson was leaving on vacation the day following the shortage

incident and she assumed that the customer would return the money while she was away

and the envelope would be replenished.

    All shortages and overages when a cash drawer is shut down for the day are

required to be accurately reported.  Using money or coupons from anywhere to balance a

cash drawer shortage is referred to in Walgreen policies as the use of a "slush fund" and

is specifically prohibited.

On April 14, 2006, Dickerson contacted her District Manager, Patrick Bradley, and reported that, while she had been at Dickerson's store, Lisa Priest had eaten candy from a stockroom table where food returns and damaged candy bags are placed.  Walgreen policy prohibits employees from eating food from this table.  Sy Coleman, Priest's direct supervisor, investigated the allegation and interviewed Priest.  Priest denied eating candy from the return table, but indicated that she did eat a piece of candy that had been offered to her by Mike Johnson.  William Boseman interviewed Johnson, who reported that he did not see Priest eat any candy from the return table and did not recall offering her any candy.  Dickerson was also interviewed and insisted that, while she and Priest were alone in the stockroom of her store, she saw Priest eat several pieces of candy.  On May 1, 2006, Priest was issued a written warning for violation of the company's "grazing" policy and was counseled by Coleman.

On May 2, 2006, Priest returned to Dickerson's store to continue her follow-up investigation based on the audit.  Because of the complaint lodged by Dickerson against Priest,  Coleman asked Frank Sorgie, another Loss Prevention Supervisor, to accompany Priest to ensure the integrity of the investigation.  Sorgie conducted an interview of Dickerson and obtained a more detailed written statement regarding the events of March 31, 2006, in which Dickerson again confirmed her authorization of the use of the found money to balance the drawer and also stated that she would occasionally take coupons out of a drawer if the count did not balance, but denied ever authorizing the use of extra

coupons to balance a drawer that was short, other than coupons which may have been found in the counter area near the drawer.  Patrick Bradley suspended Dickerson on May 2, 2006, pending further investigation.

At Dickerson's request, Sorgie took additional statements from Mike Johnson and from another Management Trainee, Carmen Rouse.  Rouse indicated that she was aware of the "slush fund" but never heard Dickerson give anyone directions to use it nor did she know if Dickerson knew of it.  She said she had only seen it used by Assistant Managers, Trey Daniels and Mike Johnson. Johnson gave Sorgie two additional statements, the first of which was in writing recounting events of March 31, 2006, and mentioning another incident Johnson was aware of when a $10 overage was kept under the cash tray by employee, Tammy Elliot, in expectation that it would be used later to balance a shortage. Johnson's second statement he volunteered orally, informing Sorgie that a couple of days after Priest's initial inquiry, the customer who had found the $100 bill and turned it in had phoned the store to ask what had happened to the money, and Dickerson instructed Johnson to tell the customer that the money had been claimed.

District Manager Bradley was briefed by Sorgie on the investigation and also spoke with Walgreen's Employee Relations department.  Bradley then informed Dickerson that her employment was being terminated effective May 6, 2006, for maintaining a slush fund, manipulating funds and lying during a Loss Prevention investigation.  At a subsequent state agency hearing with regard to Dickerson's

unemployment, Bradley was asked if he participated in the decision to terminate

Dickerson.  He answered:  "(Uhm)... the decision was made by ... (uhm) our Employee

Relations Department, based on the information gathered during the Loss Prevention

Investigation."

Subsequent to filing a charge of discrimination with the Evansville-Vanderburgh

County (Indiana) Human Relations Commission, Dickerson filed this lawsuit, alleging a

violation of 42 U.S.C. § 1981 by Walgreen.  She claims that Walgreen discriminated

against her on the basis of her race, retaliated against her for engaging in protected

activity and had a pattern and practice of discriminating against African-Americans.

After discovery was completed, Walgreen filed this motion for summary judgment.

<u>*Standard of Review*</u>

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes

concerning material facts are genuine where the evidence is such that a reasonable jury

could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court

construes all facts in a light most favorable to the non-moving party and draws all

reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither

the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir.2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." C*elotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v.*

*AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir.2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir.1999); *Slowiak v. Land O'Lakes, Inc*., 987 F.2d 1293, 1295 (7th Cir.1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  *Seener v. Northcentral Technical College*, 113 F.3d 750, 757 (7th Cir.1997); *Wohl v. Spectrum Mfg., Inc*., 94 F.3d 353, 354 (7th Cir.1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no

genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997).

### *Analysis*

The requirements Plaintiff must satisfy in order to demonstrate a *prima facie* case of racial discrimination under 42 U.S.C. § 1981 are the same as those required under Title VII of the Civil Rights Act of 1964. *Bennett v. Roberts*, 295 F.3d 687, 697-98 (7th Cir. 2002). To survive a motion for summary judgment on a claim of race discrimination, a plaintiff can proceed under either the direct or indirect methods of proof. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir.2007). To prevail under the direct method, a plaintiff must produce evidence of discrimination such as an outright admission or by "constructing a convincing mosaic of circumstantial evidence sufficient to allow a jury to directly infer intentional discrimination by the decisionmaker." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir.2004). The indirect method of proving racial discrimination requires the plaintiff to show: (1) that she is a member of a protected class; (2) she performed to the legitimate expectations of her employer; (3) despite her performance she was subjected to an adverse employment action; and (4) similarly situated individuals who were not members of the same protected class were treated more favorably. *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 559 (7th Cir. 2007). If she succeeds, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision, which the plaintiff can then attack as a pretext for discrimination.

*Id.*; *also see*, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

As previously noted, Dickerson claims that McCaffrey was the person at Walgreen who discriminated against her based on her race.  She claims that his admission to Sy Coleman that he pushed her harder than other Walgreen managers provides the necessary proof.  However, McCaffrey's statements to Coleman could only be considered an admission of discrimination if taken out of context.  Dickerson can not deny that McCaffrey chose her and no other Evansville store manager to join the ELP, a select program from which future District Managers are chosen.  This act, in itself, belies discriminatory intent but also provides important context to McCaffrey's so-called admission, because his full statement to Coleman was that he held Dickerson to a higher standard because he believed she was capable of becoming a District Manager, not because of any racial bias on his part.

Dickerson might seek to prove discrimination under the direct evidence model if she could establish a convincing mosaic of circumstantial evidence sufficient to allow a jury to directly infer discrimination by a decisionmaker.  *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).  However, such a mosaic of evidence must lead to some specific adverse action by the employer so to support an inference of discriminatory intent.  *Id.*  Here, it is undisputed that McCaffrey, the alleged perpetrator of the race-based discrimination, perpetrated no specific adverse action toward Dickerson and played no part in the decision to terminate her employment.  Dickerson points to nothing that

-18-

McCaffrey did that amounts to an adverse employment action against her.  Accordingly, her claim of discrimination fails under both the direct and indirect methods of proof.

Courts have often observed that not everything that makes an employee unhappy constitutes an actionable adverse action under federal discrimination laws.  *E.g., Nagle v. Village of Calumet Park,* 554 F.3d 1106, 1116 (7th Cir. 2009).

> ... there are three general categories of actionable, materially adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Id*. (citing, *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) and *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004).

A careful examination of all of Dickerson's allegations of discriminatory actions by McCaffrey, as detailed in the extensive recitals set forth above, reveals nothing that arguably falls within any of the three general categories in *Nagle*.  Many of her allegations are trivial in nature, such as McCaffrey's failure to visit Plaintiff's store when he was in Evansville.  Others are based on inadmissible hearsay, like McCaffrey's supposed reference to her as a "manipulator."  Whether considered separately or together,

they are, at best, minor incidents in an otherwise normal career progression and work history.  In short,  Dickerson lacks any evidence to support her claim that she suffered an actionable adverse employment action.  Only her termination, which she contends was retaliatory, bears a second look by the Court.

Retaliation is a prohibited form of discrimination under both Title VII and Section 1981, *see CBOCS West, Inc. v. Humphries*, __ U.S. __ , 128 S.Ct. 1951 (2008), and can be proven by either the direct or indirect method.  However, a retaliation claim must meet a distinct standard of proof in order to survive summary judgment:

> Under the direct method, an employee must demonstrate that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by his employer; and (3) there was a causal connection between the statutorily protected activity and the adverse action. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir.2006). Under the indirect method, a plaintiff must prove that (1) he engaged in statutorily protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id*.

*Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008).

Starting with the requirement that Dickerson must be determined to have engaged in protected activity, we find that her complaints to Walgreen supervisors of racial discrimination by McCaffrey constitute the only possible statutorily protected activity at issue here.  Neither Dickerson's act of reporting that Priest ate candy from the return table nor her inquiry of Bradley as to whether Walgreen had diversity training materials for use

in district meetings was protected activity.  In order to constitute protected activity, the

employee must have had a subjectively  sincere and objectively reasonable belief that she

was opposing an unlawful practice.  *Hamner v. St. Vincent Hosp. and Health Care

Center, Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000).  Only her complaints about McCaffrey

satisfy that requirement.

Under the direct method of proof, Dickerson has succeeded in establishing the first

two of the three necessary elements of her claim: she complained of discrimination by

McCaffrey and she was fired.  What she lacks is evidence of any causal relationship

between the two events.  Dickerson was terminated in May of 2006, following an

investigation into a money management incident at her store which situation had

developed over the previous two months.  McCaffrey had not been Dickerson's

supervisor since May of the <u>previous</u> year.  Furthermore, the last of her complaints to

Walgreen regarding McCaffrey was made several months before he was replaced as

District Manager.  The most common manner of establishing a casual link between an

adverse employment action and an employee engaging in protected activity is to show

that the adverse action came on the heels of the protected activity.  *See Filipovic v. K & R

Exp. Systems, Inc.,* 176 F.3d 390, 398 (7th Cir. 1999).  A substantial time lapse between

the events, such as the year and more here, is counter-evidence of a causal connection.

*Id.*

It is incumbent upon Dickerson to adduce evidence that reasonably suggests that

her complaints about McCaffrey and her termination were somehow related events. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). Evidence of suspicious timing is altogether lacking here. The extended sequence of intervening events further erodes any cause and effect linkage. In addition, no evidence other than timing ties the two together.[2] Thus, Dickerson has failed in her attempt to establish direct proof of retaliation.

The indirect method of proving retaliation omits the requirement that Plaintiff must prove a causal nexus and substitutes the requirements that she must demonstrate that she was meeting her employer's reasonable expectations and that she was treated in a worse way than other similarly situated employees who had not engaged in protected activity. *Andonissamy*, 547 F.3d at 850. Dickerson argues that she was fully meeting Walgreen's expectations prior to what she believes was an investigation initiated for the purpose of finding something on which to base her otherwise unfounded termination. Walgreen does not directly dispute that fact; rather, it focuses on the requirement that

_____

[2]Dickerson argues that Bradley's testimony before the state agency regarding her unemployment claim that the Employee Relations Department at Walgreen made the decision that she would be terminated is contrary to Walgreen's postion and Bradley's depostion testimony that he was the decisionmaker with respect to her termination. This conflict, she says, is circumstantial evidence of a discriminatory basis for her discharge. However, the evidence does not disclose much of a conflict. Walgreen has never contended that Bradley acting alone did or could make the decision to fire her. Bradley himself testified that he spoke with Employee Relations before contacting Dickerson to inform her that she was being fired. Furthermore, even if there were a conflict, the conflict does not bring us any closer to the conclusion that Dickerson's complaints of McCaffrey in the winter or spring of 2005 led to the decision by Employee Relations and/or Bradley to discharge her in May of 2006.

Dickerson has failed to show that others were treated more favorably, in that Dickerson has offered no evidence of anyone who is legitimately comparable to her as a similarly-situated employee.

Dickerson argues that Mike Johnson, Trey Daniels, Jason Deason and Tammy Elliot were all Walgreen employees identified as having some role in utilizing a "slush fund" or mishandling coupons to balance a cash drawer.  Further, she contends it was Johnson who initially brought up the option of using the $100 that had been turned in to him by a customer to balance the drawer on March 31, 2006.  However, Dickerson was the direct supervisor of these four employees, all of whom were either Assistant Managers or management trainees.  In fact, Bradley testified that the reason these individuals were not disciplined was because they were following the direction and practices established by the Store Manager, Dickerson.  The Seventh Circuit has consistently recognized that supervisory plaintiffs are not similarly situated to their subordinates.  *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002); *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1124 (7th Cir. 1998).

Dickerson compares her treatment to that of a white female Store Manager, who apparently threatened to kill McCaffrey.  Dickerson contends that after the date of her termination, the white Store Manager who had threatened McCaffrey was also fired, but received some type of severance, whereas she (Dickerson) was "simply shown the door." Putting aside the fact that Dickerson's evidence of the circumstances surrounding the

-23-

termination of this other manager is primarily based on hearsay, her argument still misses the mark.  McCaffrey, whose testimony with regard to the other store manager provides the only non-hearsay evidence on this point, admits that he terminated the white Store Manager who had threatened him and permitted her to continue to receive certain job-related benefits because the woman was a twenty-year employee who had also threatened to kill herself at the same time she threatened him, and McCaffrey said he wanted to make sure she could continue to receive needed psychiatric treatment.  McCaffrey, as has been indisputably established, played no role in the decision to terminate Dickerson, another reason for the Court not to regard either of the two circumstances or the two employees as similar.

Dickerson has thus been unable to establish a *prima facie* case of retaliation based on her having engaged in protected activities.

Finally, we address Dickerson's claim that Walgreen has a pattern and practice of discriminating against African-American employees.  Pattern and practice claims are typically raised in a class action to show that an employer had a wide-ranging policy to discriminate against class members.  *See Gilty v. Village of Oak Park,* 919 F.2d 1247, 1252 (7th Cir. 1990).  Individual plaintiffs do sometimes use pattern and practice evidence to demonstrate pretext under the indirect method of proving discrimination after the employer has articulated a legitimate reason for the adverse employment action in response to plaintiff's *prima facie* showing.  *See Bell v. E.P.A.*, 232 F.3d 546, 552-53 (7th

-24-

Cir. 2000).  Nevertheless, because Dickerson has failed to establish a *prima facie* case of discrimination, evidence of pattern and practice, assuming there was any, would be of little legal significance.

Indeed, Dickerson has not been able to adduce any admissible evidence to support this claim.  Her sweeping allegations of discrimination and the hardships suffered by African-American employees at Walgreen lack any statistical or anecdotal support.  She simply cites the pending class action and consent decree against Walgreen in another federal district court as proof by implication of the discrimination she and other African-American employees have suffered at the hands of Walgreen.  In order to overcome a summary judgment motion in her individual action, however, Dickerson must come up with more than she has been able to offer here in support of her claims.

### *Conclusion*[3]

Dickerson has failed to satisfy the evidentiary thresholds necessary to withstand a summary judgment motion on her claims of race discrimination and retaliation by her employer, Walgreen.  Accordingly, Walgreen's Motion for Summary Judgment (Doc.

---

[3]In its summary judgment motion, Walgreen argued that Dickerson's damages, if any, would be limited by the after acquired evidence doctrine.  Walgreen asserts that  Dickerson has admitted to lying on her application for employment with Walgreen regarding the involuntary separation she had with her previous employer.  According to Walgreen, this would have eliminated her from consideration for employment, and therefore she would not be entitled to damages for lost wages past the date when she admitted to this discrepancy during discovery.  Because we have found insufficient evidence to support any of her claims of discrimination, we need no reach a decision on the issue of after acquired evidence.

#39) is **GRANTED**.  A separate final judgment in favor of the Defendant Walgreen shall

issue.

IT IS SO ORDERED

Date:   03/31/2009

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Tony Curtis Coleman
FROST BROWN TODD LLC
tcoleman@fbtlaw.com

J. Gregory Joyner
NABER JOYNER & JAFFE
fhill@njslaw.net

Susan C. Lonowski
FROST BROWN TODD LLC
slonowski@fbtlaw.com

LaQuita S. Wornor
FROST BROWN TODD LLC
lwornor@fbtlaw.com

-26-